IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Cr. No. 20-1902 MLG |
| ) | |
| vs. ) | |
| ) | |
| **JOSEPH LEYVA** and ) | |
| **PATRICK GILMAN**, | |
| ) | |
| Defendants. ) | |

### UNITED STATES' RESPONSE TO DEFENDANT PATRICK GILMAN'S MOTION TO SUPPRESS STATEMENTS

The United States of America, through its undersigned counsel, hereby responds in opposition to Defendant Patrick Gilman's Motion to Suppress Statements (Doc. 84) (hereinafter referred to as "Motion to Suppress").

### BACKGROUND

**A. Events that led to the arrest of the Defendants**

On August 3, 2020, at approximately 11:50 p.m., New Mexico State Police ("NMSP") Officer Arturo Casillas attempted to conduct a traffic stop on a white Dodge Charger that was traveling on State Road 467, near mile post 15, in Curry County, New Mexico, at a speed of over 100 mph and without its headlights illuminated. The driver fled from the NMSP officer, who gave chase. The vehicle, which officers later determined was registered to Joseph Leyva, eventually drove into a cornfield where it became stuck. The occupants of the vehicle fled on foot through the cornfield and officers were unable to apprehend the occupants.

On August 4, 2020, NMSP detectives executed a search warrant on the vehicle. During the execution of the search warrant, detectives recovered cell phones, ammunition, two firearms,

and phone bills. The two handguns located in the vehicle were identified as follows: a Glock, model 26 9mm semiautomatic pistol bearing serial number CCF852 and a Taurus, model G2C 9mm semiautomatic pistol bearing serial number ABC380021. Both pistols had high-capacity extended magazines in them. NMSP detectives identified Patrick Gilman as one of the occupants of the vehicle from a phone bill and a phone that were recovered from the vehicle.

On August 6, 2020, NMSP officers observed Gilman driving a Pontiac SUV in Clovis, New Mexico. Officers then conducted a traffic stop on the vehicle. Gilman fled the vehicle on foot and was apprehended by the officers after a short foot pursuit. Gilman was arrested for resisting and evading an officer.

Officers contacted the passenger of the vehicle, F.O., who advised them that Gilman had told him about being in a car chase and a shootout with NMSP officers two days prior. F.O. told officers that Gilman said he had dropped his firearm in the cornfield while running on foot and could not find it. Based on this information, NMSP officers went back to the cornfield and searched for the firearm. They recovered a black ATI model GSG Firefly, .22 caliber pistol, serial number F425828, a cell phone and a used syringe together in the field.

Officers also learned that there was another passenger inside the white Dodge Charger during the original pursuit. On August 10, 2020, NMSP Sgt. Victor Hernandez spoke to the other passenger of the white Dodge Charger, E.S. The passenger identified the driver of the white Dodge Charger as Joseph Leyva. The passenger also stated that she observed two firearms inside the vehicle. She further stated that Leyva fired a handgun at the police until it was out of bullets and then threw the firearm into the backseat burning her leg. E.S. stated he fired at least ten rounds. She stated that Gilman was also shooting at the pursuing officer from the rear passenger window.

**B. Defendant Gilman's Statements to Law Enforcement**

On August 12, 2020, NMSP Agent Kenneth Villareal, Officer Arturo Casillas and Sgt. Gerardo Hernandez met with Gilman in the designated booking room of the Curry County Detention Center to serve a search warrant for DNA and arrest warrant for the August 3, 2020 incident, and to talk to Gilman. Sgt. Hernandez read Gilman his *Miranda* rights. Exhibit ("Ex.") 1 at 2:30 (audio and video recorded interview of Gilman). Sgt. Hernandez asked Gilman questions about the August 3, 2020 incident, but Gilman initially denied any involvement. Sgt. Hernandez executed the search warrant to collect Gilman's DNA through buccal swabs. Thereafter, the following conversation occurred:

| | |
|---|---|
| Gilman: | "So how you can help me get out if I cooperate, man?" |
| Sgt. Hernandez: | "If you tell me exactly what went down, bro." |
| Gilman: | "And how do I know that word's good?" |
| Sgt. Hernandez: | "What do you mean, how do you know?" |
| Gilman: | "I got to know you can really help me get out." |
| Sgt. Hernandez: | "I need to know, first, if you're going to be honest with me." |
| Sgt. Hernandez: | "We'll talk right now. Okay?" |

Ex. 1 at 5:53. Gilman nodded his head, agreeing to talk to Sgt. Hernandez. At this time, there was another inmate entering the booking room and being escorted by police officers, and Sgt. Hernandez waited until the inmate was escorted out of the room before asking any questions to Gilman.

During this interview, Gilman admitted he was a passenger in the white Dodge Charger. Ex. 1 at 10:32. He stated that one of the handguns [that Leyva was using] jammed and he cleared the jam from the pistol. *Id.* at 11:40. He also admitted to being a

3

convicted a felon. [1] *Id.* at 12:28. This interaction was audio and video recorded and it lasted 16 minutes and 22 seconds.

## ARGUMENT

The United States does not contest that Gilman was in custody and interrogated for purposes of the instant motion.  Doc. 84 at 6.  Rather, the issues for the Court's resolution are whether Gilman waived his *Miranda* rights, and therefore, he waived his right to remain silent, and whether subsequent statements were voluntary.

The Fifth Amendment states: "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V. Relying on the Fifth Amendment, the Supreme Court has held that if a suspect is in custody and police interrogate him, they must inform him of his *Miranda* rights, or his responses cannot be introduced into evidence at trial to establish his guilt. *See Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court reasoned that depriving individuals of liberty and subjecting them to interrogation is equivalent to compelling them to speak in violation of the Fifth Amendment. Custody occurs when the defendant "has been taken into custody or otherwise deprived of his freedom of action in any significant way" 384 U.S. at 444.

**A. Defendant Gilman's August 12, 2020 interview was a custodial interrogation and he voluntarily, knowingly and intelligently waived his *Miranda* rights.**

Any person subject to custodial interrogation is constitutionally entitled to receive *Miranda* rights, and a failure to receive these rights makes any subsequent statements *per se* inadmissible. *See Dickerson v. United States*, 530 U.S. 428 (2000); *Miranda v. Arizona*, 384 U.S.

---

[1] Gilman also implicated co-defendant Joseph Leyva. However, the United States does not intend to introduce into evidence Gilman's statements implicating Leyva. Although the United States is submitting the entire recording for the Court's consideration as to the totality of the circumstances of the interview, the recording that the government intends to introduce at trial will be a redacted version of Gilman's interview.

436 (1966). The strictures of *Miranda* only apply when a defendant is both (1) in custody and (2) being interrogated. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Here, the parties agree that the Gilman was in custody.

The Supreme Court has stated that "*Miranda* prescribed the following four now-familiar warnings: a suspect must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Florida v. Powell*, 559 U.S. 50, 59-60 (2010) (citation and internal quotation marks omitted). Further, the Supreme Court has said that "[i]n determining whether police officers adequately conveyed the four warnings, . . . [t]he inquiry [of the reviewing courts] is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Id.* at 60 (citation and internal quotation marks omitted). There is no requirement that *Miranda* warnings must be given orally *and* in writing. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written *or* oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of validity of that waiver.") (emphasis added); *see, e.g.,* U*nited States v. Granados,* 846 F. Supp. 921, 926 (D. Kan. 1994) (written waiver is not required).

For a defendant's *Miranda* waiver to be valid, that waiver must be made "voluntarily, knowingly and intelligently" *Miranda*, 384 U.S. at 444. The Supreme Courts has held that "courts can infer a waiver of *Miranda* rights from the actions and words of the person interrogated." *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (citation and internal quotation marks omitted). "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving

5

any answers or admissions. Any waiver, express or implied, may be contradicted by an invocation at any time." *Id.* at 387-88. *See also United States v. Zuhrieh*, 124 F. Supp. 3d 1187, 1191 (D.N.M. 2015) (Vazquez, J.) ("an express statement of waiver is not required; the waiver can be inferred from the defendant's actions and words."). The Supreme Court has held that the "relinquishment of the right must have been voluntary[,]" and "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Courts should consider the "totality of the circumstances surrounding the interrogation" in deciding whether these prerequisites are satisfied. *Id.* (quotation and citation omitted); *see also United States v. Burson*, 531 F.3d 1254, 1256-57 (10th Cir. 2008) ("In determining whether a waiver of rights was knowing and intelligent, we employ a totality of the circumstances approach").

A defendant who equivocally invokes his right to remain silent may waive his *Miranda* rights if he initiates contact or discussion with law enforcement. *Berghuis v. Thompkins*, 560 U.S. at 389 (holding the defendant "waived his right to remain silent by making a voluntary statement to the police."). *See, e.g.,* U*nited States v. Morris,* 42 F. App'x 223, 228 (10th Cir. 2002) ("[t]he accused . . . may voluntarily waive his Fifth Amendment rights after invoking the right to counsel if he initiates contact or discussion with authorities."); s*ee also Minnick v. Mississippi*, 498 U.S. 146, 156 (1990) ("*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities[.]"); *United States v. Johnson*, 42 F.3d 1312, 1318 (10th Cir. 1994) (defendant who was informed of probable sentences and benefits of cooperation and who then invoked right to counsel initiated contact with officers by asking sometime later "What, exactly, can I do to help myself out?").

6

"In determining whether rights were voluntarily waived, [the Tenth Circuit] consider[s]: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." *United States v. Woody*, 45 F.4th 1166, 1177 (10th Cir. 2022) (citation and internal quotation marks omitted).

Here, Gilman did not unequivocally invoke his right to remain silent. In fact, he initially denied any involvement in the August 3, 2020 incident. But if the Court finds that Gilman invoked his right to remain silent, the United States submits that Gilman waived his rights when he initiated conversation with Sgt. Hernandez, when he asked Sgt. Hernandez, "what can I do to help myself?", Ex. 1 at 5:53, and then made voluntary statements to Sgt. Hernandez.

Gilman was a twenty-one-year-old adult male of at least average intelligence without any apparent mental defect that impaired his ability to exert his will. Although Gilman has an eight-grade education, he reported working as a cook and landscaper. Doc. 9 at 2. Most importantly, Gilman's responses to the questions posed were appropriate and coherent. *See* Ex. 1; *see also United States v. Lamy*, 521 F.3d 1257, 1262 (10th Cir. 2008) (holding that the defendant was "capable of understanding the agents' questions and assessing the risks of answering or declining to answer those questions" even when there were indications that the defendant was "functionally illiterate, reading at a second-grade level, that he flunked out of school after the eighth grade, and that he was psychologically inclined to acquiesce to authority figures.").

Next, Sgt. Hernandez read Gilman his *Miranda* rights, and as stated by the case law, there is no requirement that written *Miranda* waiver must be given to a suspect in addition to verbal warnings. Further, as Gilman acknowledged during the interaction with Sgt. Hernandez, this was not Gilman's first contact with the criminal justice system and *Miranda* rights, rather

Gilman's criminal history supplied him knowledge in this regard. *See* Ex. 1 at 12:28. (Gilman admitting that he was a convicted felon); *see also United States v. Goebel*, 959 F.3d 1259, 1269 (10th Cir. 2020) ("[Defendant] also had a criminal history; suspects with prior experience in the criminal justice system are more likely to have knowingly waived their *Miranda* rights because [t]he concepts encompassed by *Miranda* [are] not foreign to them." (internal quotations omitted) (alternations in original)).

The length of the interview also favors a finding of voluntariness. Indeed, the only thing remarkable about the length of the interview was how *short* it was, lasting approximately sixteen minutes and twenty-two seconds. *See* Ex. 1. The Supreme Court, Tenth Circuit, and courts in this district have all held that interviews lasting well in excess of this length were not coercive. *See Berghuis v. Thompkins*, 560 U.S. at 387 (holding that an interrogation that lasted three hours was not coercive); *United States v. Rodebaugh*, 798 F.3d 1281, 1292 (10th Cir. 2015) (holding that interview that lasted three to four hours was not unduly long); *United States v. Woody*, 2020 WL 3513486, at *26 (D.N.M. June 29, 2020) (finding that an interview lasting one hour and fifteen minutes was not unduly coercive and cataloguing other cases with similar findings).

There were no threats nor physical force against Gilman. Although the interview took place at a police-dominated atmosphere, a detention center, Sgt. Hernandez did not threaten Gilman nor did he use force against Gilman. To the extent that Gilman claims that Sgt. Hernandez coerced Gilman by using forms of deception, the Tenth Circuit has held that "not all deceit and trickery is improper, the surrounding circumstances are significant to the analysis, and the operative question is whether deceit or trickery is used to imply an individual has no ability to refuse consent." *Woody*, 45 F.4th at 1176.

Further, Sgt. Hernandez's questioning was not coercive. *See generally* Ex. 1. As demonstrated in the recording, his demeanor, while firm, was not coercive. Sgt. Hernandez maintained a professional tone throughout the conversation. At no time did Sgt. Hernandez use or threaten to use physical force. While Sgt. Hernandez informed Gilman that he "had called ATF," this statement was correct, not coercive. A number of courts have found that true statements about a defendant's predicament, even if intimidating or intended to induce a waiver, do not amount to the type of coercion that renders a waiver or subsequent statements involuntary. *See United States v. Carpentino*, 948 F.3d 10, 29 (1st Cir. 2020) (rejecting defendant's claim that troopers' true statement to a defendant that invoking his right to counsel would make a later interview unlikely was coercive and noting that "[t]he troopers may have thought that telling the defendant that counseled interviews are rare would induce him to agree to talk, but even 'the use of chicanery does not automatically undermine the voluntariness' of a *Miranda* waiver"); *United States v. Varela*, 576 F. App'x 771, 777 (10th Cir. 2014) (holding that agents true statements about the strength of the evidence did not render the defendant's *Miranda* waiver to be involuntary); *Dowell v. Lincoln Cnty.*, 762 F.3d 770, 776 (8th Cir. 2014) (finding that law enforcement "may make a truthful statement regarding a possible punishment without it overbearing a defendant's will"); *United States v. Tyson*, 360 F. Supp. 2d 798, 810–11 (E.D. Va. 2005) (noting that agent's true statements about the strength of the evidence and possible penalties "though perhaps intimidating, cannot be said to be unduly coercive since truthful statements about [the defendant's predicament] are not the type of coercion that threatens to render a statement involuntary" (internal citations and quotation omitted)). In sum, both Gilman's characteristics and the details of the interview support a finding that Gilman voluntarily, knowingly and intelligently waived his *Miranda* rights.

### B. Defendant Gilman's Waiver and Subsequent Statements Were Voluntary

Gilman's argument that his statements were not voluntary but the product of deception, misrepresentation and promises of leniency is equally unavailing. The details of the interaction between Sgt. Hernandez and Gilman support a finding of voluntariness.

As discussed earlier, Gilman's age, education, and intelligence show that he was capable of making a voluntary statement. Gilman was advised of his constitutional rights. And the length of the interview also favors a finding of voluntariness.

Gilman fails to articulate how any perceived deception on Sgt. Hernandez's part makes his statements involuntary. *See Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (holding that misrepresentations made about evidence in a case, without more, do not render an otherwise voluntary confession involuntary). Although Sgt. Hernandez did not have any conclusive DNA results at the time, he had video of the August 3, 2020 incident and he had contacted agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Further, Sgt. Hernandez did not promise Gilman a specific form of leniency if he confessed nor he threaten exaggerated consequences if Gilman did not cooperate.

Gilman asserts that the alleged deception prompted his confession. Doc. 84 at 9. But rather it was Gilman who initiated conversation with Sgt. Hernandez. Thus, any deception on the part of Sgt. Hernandez did not even appear to prompt Gilman's confession because he initially denied any involvement in the August 3, 2020 incident. However, should the Court find that Sgt. Hernandez' was deceptive, it was not unlawful. Both the Supreme Court and the Tenth Circuit have held that law enforcement may use deceptive tactics in speaking with suspects so long as those tactics are not unduly coercive. *See, e.g., Frazier v. Cupp,* 394 U.S. 731, 739 (1969) (false statement to suspect that accomplice had already confessed did not render the suspect's

confession coerced or involuntary); *Oregon v. Mathiason*, 429 U.S. 492, 495-96 (1977) (officer's false statement to suspect that suspect's fingerprints had been found at the crime scene did not render interview "custodial" under *Miranda*); *Lucero*, 133 F.3d at 1311 (false statement that officers recovered suspect's fingerprints in victim's house did not render inculpatory statements involuntary); *United States v. Unser*, 165 F.3d 755, 766–67 (10th Cir. 1999) (agents employed a "measure of subterfuge" by inducing defendant to return to their offices when defendant did not know he was the target of a criminal investigation, and defendant believed officers merely wanted to help him retrieve his snowmobiles; nonetheless, defendant's will was not overborne and statements were admissible). *Cf. United States v. Harrison*, 639 F.3d 1273, 1279 (cautioning that when deceptive tactics "create[] the impression that the defendant will be in physical danger if he or she refuses to consent[,]" they can render consent involuntary). While Sgt. Hernandez's statements about having DNA and video, and that ATF agents were picking him up, may have played a role in Gilman's decision to participate in the interview, it did not suggest that Gilman was required to speak, nor did it render his subsequent inculpatory statements involuntary.

Impermissible compulsion arises when an accused's statements, under the totality of the circumstances, are the product of government action that overcame the accused's will and "capacity for self-determination." *See United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006); *see also United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020). There is no evidence to suggest Gilman is someone whose will would be easily overcome. In fact, his interview shows that he is an intelligent, capable adult with the ability to ask questions and decide which questions to answer.

Gilman claims that Sgt. Hernandez's alleged deceptions, misrepresentations and suggestions of leniency rendered his statements involuntary. Doc. 84 at 11-16. The recorded

interview shows that none of the statements made by Sgt. Hernandez, in combination or individually, rise to the level of coercion, which would render his statements involuntary. "Certain forms of deception by officers can be indicative of coercion, which would render consent to searches or seizures involuntary under the Fourth Amendment." *Woody*, 45 F.4th at 1176. "But not all deceit and trickery is improper, [. . .] the surrounding circumstances are significant to the analysis, and the operative question is whether deceit or trickery is used to imply an individual has no ability to refuse consent." *Id.* (citation and internal quotation marks omitted).

"Where a promise of leniency has been made in exchange for a statement, an inculpatory statement would be the product of inducement, and thus not an act of free will." *Young*, 964 F.3d at 944 (quotations omitted). In *Young*, the officers told the defendant he could "buy down" the amount of time he spent in federal prison by cooperating. *Id.* at 943. The officer then repeatedly told the defendant "he had spoken with a federal judge who had reviewed the case," and that "every time you answer a question truthfully, it ticks time off that record . . . that's the way it works." *Id.*

No such promise of leniency was made in this case. Sgt. Hernandez told Gilman that he could help him if he were honest with him, *see* Ex. 1 at 3:33, 4:37, 4:44, but that is not the same as offering him leniency for cooperation. There was no coercion involved in this interview.

Even if the Court finds Sgt. Hernandez actions were coercive, Gilman's personal characteristics prevent his statement from being involuntary. Gilman's personal characteristics support a finding that his waiver was voluntary. Nothing in the interview demonstrates that Gilman was unable to understand and exert his own will due to his age, intelligence, or education. Rather, Gilman's age, education, and intelligence show that he was capable of making

a voluntary statement. Gilman's characteristics coupled with the lack of any coercive factors (physical punishment, lengthy questioning, lack of food or sleep) show that Gilman's August 12, 2020 statements were voluntary. As such, this Court should deny Gilman's request to suppress these statements.

## CONCLUSION

For the foregoing reasons, the Court should conclude that (1) Gilman voluntarily, knowingly and intelligently waived his *Miranda* rights during the August 12, 2020 custodial interrogation, and (2) thus Gilman's post-*Miranda* statements to Sgt. Hernandez are admissible at trial in this matter because his statements were voluntary.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed July 31, 2023*
RAQUEL RUIZ-VELEZ
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico  87103
(505) 346-7274
(505) 346-7296 fax

I HEREBY CERTIFY that on the 31st
day of July, 2023 I filed the foregoing
pleading electronically through the CM/ECF
system, which caused counsel of record
to be served by electronic means on this date.
*/s/*_____
Raquel Ruiz-Velez
Assistant U.S. Attorney

13