IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                          Case No. 1:20-cr-01902-MLG

PATRICK GILMAN and
JOSEPH LEYVA,

    Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT PATRICK GILMAN'S MOTION TO SUPPRESS AND DENYING AS MOOT DEFENDANT JOSEPH LEYVA'S MOTION TO SEVER**

This matter comes before the Court on Defendant Patrick Gilman's Motion to Suppress Statements and Defendant Joseph Leyva's Motion to Sever, both filed on July 10, 2023. Doc. 84; Doc. 85. Having reviewed the parties' submissions and the applicable law, and having held a hearing on October 31, 2023, the Court grants Gilman's Motion to Suppress and denies Leyva's Motion to Sever as moot.

## BACKGROUND

On August 3, 2020, the occupants of a vehicle (alleged to be Gilman and Leyva) led police on a high-speed chase through Clovis, New Mexico. Doc. 115 at 1. During the pursuit, the occupants allegedly discharged firearms at police. Doc. 131 at 3. Several days later, police observed Gilman driving a different vehicle and initiated a traffic stop. Doc. 84 at 2. He attempted to flee on foot. *Id.* After a short pursuit, police tased and arrested Gilman for resisting and evading an officer. *Id.*

On August 12, 2020, Lieutenant Gerardo Hernandez interviewed Gilman while he was in custody about the events of August 3. The interview took place in the booking room at the Curry

1

County Detention Center. Doc. 95 at 3. The interview itself lasted about sixteen minutes. *See generally* Gov't Ex. 1.

Before commencing the interrogation, Hernandez read to Gilman his *Miranda* rights from a card in his wallet (albeit at a hurried pace, while mumbling, and without any real effort to ensure comprehension). *Id.* at 2:28-53. He then asked Gilman if he understood those rights, to which Gilman appeared to nod his head in the affirmative. *Id.* at 2:52-56. Then Hernandez asked him, "Do you still want to talk to me?" *Id.* at 2:55. Gilman moved his head in response, although it is unclear whether he intended to respond in the affirmative or the negative. *Id.* at 2:55-58. He then asked Hernandez, "About what?" *Id.* After some back and forth, the encounter continued:

> Hernandez: August 3rd bro. When you guys were being chased by the police.
>
> Gilman: [inaudible]
>
> Hernandez: No, the first time bro. When you and your homie was [sic] running.
>
> Gilman: I know nothing about that.
>
> Hernandez: Well, we got witnesses bro. I mean you really wanna go that route?
>
> Gilman: I guess so. I got nothing to say about that.
>
> Hernandez: Just know. Just know that . . . I'm here to . . . If you want to help yourself, you need to help me dude. Cause I'm gonna help you if you're honest with me. Do you understand what I'm saying? Cause we did our homework. We got DNA. We got witnesses. We got video. And you're a convicted felon. Okay? We got guns with your DNA. I ain't gonna charge you. State will charge you probably right now. But guess where else you're gonna go. You're going to the fed homie. You really wanna go this route with not talking to me? I already called ATF. They're ready to take you. You still wanna be quiet and not talk to me?

*Id.* at 3:09-4:05. Gilman responded, "I don't even know," before Hernandez cut him off by pronouncing, "Gotcha." *Id.* at 4:05. The dialogue continued with Hernandez pressing Gilman, telling him, "You got 'til we leave here man to make up your mind if you really wanna talk to me man because I can help you," and "Look at me. I can help you." *Id.* at 4:21-30. Gilman asked,

2

"Help me how though?" before continuing to deny involvement in the August 3 incident. *Id.* at 4:40-55.

At one point, another inmate walked into the booking room. *Id.* at 6:05. Hernandez paused and no words were exchanged between Hernandez and Gilman during this period. *Id.* at 6:10-10:20. After the inmate left, Hernandez reinitiated the conversation:

Hernandez: Alright Patrick, man. This is the deal okay. How old are you?

Gilman: Twenty-one.

Hernandez: Damn man. Twenty-one years old, dude. Why the hell are you guys doing that shit for man?

Gilman: I don't even know. I was just sitting in the back seat, man.

Hernandez: You were just sitting in the backseat of the car?

Gilman: [nods head in the affirmative]

Hernandez: Where's the blast coming from? Who was blasting?

Gilman: Who was blasting? Uh, I just know it was in the front. The one driving is the one that was blasting.

Hernandez: The one driving was the one blasting.

Gilman: [nods head in the affirmative]

Hernandez: And I'm right with the name[1] that I said that was driving, huh?

Gilman: Yeah.

*Id.* at 10:20-55. Gilman denied shooting a firearm at police that evening. *Id.* at 11:25-40.

Gilman was eventually charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). *See generally* Doc. 14. He now moves to

---

[1] Earlier in the exchange, Hernandez told Gilman that he knew that Leyva was driving the vehicle on August 3. *Id.* at 5:00-10.

suppress the statements he provided to Hernandez during that August 12 interview, asserting that he did not validly waive his *Miranda* rights and that his invocation of the right to remain silent went ignored. Doc. 84 at 4.

## DISCUSSION

**I.  Suppression of Gilman's statements to Hernandez is warranted.**

**A.  Gilman unequivocally invoked the right to remain silent.**

"No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. This privilege against self-incrimination requires the suppression of statements given by a suspect during a custodial interrogation without a prior warning. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "Under *Miranda*, law enforcement officers must advise a suspect who is subjected to custodial interrogation that he has the right to remain silent, that statements can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed." *United States v. McCluskey*, 893 F. Supp. 2d 1117, 1138 (D.N.M. 2012). "If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010). Invocation of the right must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda*, 384 U.S. at 479).

The test to determine whether the right to remain silent has been unambiguously invoked is an objective one.[2] It asks "whether the suspect's statement is 'sufficiently clear that a reasonable

---

[2] For example, the Tenth Circuit in *United States v. Giles* affirmed a district court's finding that a defendant, who had asked an officer when he would be given an opportunity to talk to an attorney, unambiguously invoked his right to counsel. 967 F.2d 382, 385-86 (10th Cir. 1992). The Tenth Circuit reasoned that, although the defendant "did not expressly request an attorney, [his] statement could be reasonably construed to be such a request." *Id.* at 386.

4

police officer in the circumstances would understand the statement to be a request [to remain silent].'" *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006) (citation omitted).³ However, "ambiguous or equivocal statements that *might* be construed as invoking the right to counsel do not require the police to discontinue their questioning." *Id.* at 1212; *see also Davis v. United States*, 512 U.S. 452, 461 (1994) ("We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.").

With these legal maxims serving as a polestar, the Court concludes that Gilman unequivocally invoked the right to remain silent when he stated, "I know nothing about that" and "I guess so. I got nothing to say about that." By uttering these words, Gilman was expressing a desire for the questioning to cease. *Compare United States v. Rambo*, 365 F.3d 906, 910-11 (10th Cir. 2004) (holding that the defendant unambiguously invoked the right to remain silent when he responded "no" after being asked by police if he wanted to speak with them about the alleged offenses), *United States v. McCarthy*, 382 F. App'x 789, 792 (10th Cir. 2010) (concluding that the defendant unambiguously invoked the right to remain silent when he said, "I don't want nothing to say to anyone," responded "no" when officers followed up to ask if he had "anything to say to anybody," and then asked about his rights), *and United States v. Coriz*, Cr. No. 17-1105, 2018 WL 4222383, at *5-6 (D.N.M. Sept. 5, 2018) (finding that the defendant unambiguously invoked the right to remain silent when he said "I have nothing more to say" and "I don't need to say any more"), *with Davis*, 512 U.S. at 462 (holding that the defendant's statement "maybe I should talk to a lawyer" was insufficient to serve as an unambiguous invocation of the right to counsel). A

---

³ This test "applies to both components of *Miranda*: the right to counsel and the right to remain silent." *Nelson*, 450 F.3d at 1211-12 (internal quotations omitted)

reasonable officer would have understood these statements to be a clear invocation of the right to remain silent.

After Gilman invoked his right to remain silent, Hernandez was required to cease questioning. He failed to do so. Instead, he continued the interview by discussing potential leniency (vague offers to "help" Gilman), the evidence (the DNA, the witnesses, and the video), and possible federal charges (stemming from Gilman's status as a felon). Gov't Ex. 1 at 3:30-4:05. Because Hernandez did not "scrupulously honor" Gilman's invocation, any subsequent statements (made between invocation and reinitiation of the interrogation) will be suppressed.

**B.     Gilman's subsequent statements to Hernandez (made after reinitiation of the interrogation) do not constitute a waiver of the right to remain silent and should therefore be suppressed.**

"It is well settled that a defendant, who has previously invoked the right to counsel, may change his mind and speak with police so long as the defendant (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *United States v. Santistevan*, 701 F.3d 1289, 1294 (10th Cir. 2012) (internal quotation marks omitted) (citing *Smith v. Illinois*, 469 U.S. 91, 95 (1984)). The Government bears the burden to prove a valid waiver by a preponderance of the evidence. *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008). In this case, Gilman previously invoked his right to remain silent. The question now is whether the Government has met its burden to show that Gilman changed his mind by initiating contact with Hernandez and knowingly and intelligently waiving the right he had previously invoked. The Court concludes that it has not.

As for the first prong, Gilman did not reinitiate contact with Hernandez. The inquiry is whether there was "some break in the interrogation" and whether law enforcement played an active role in continuing the interview. *Rambo*, 365 F.3d at 911. Here, there was no break in the

6

interrogation: Hernandez did not pause or suspend the interrogation after Gilman invoked his right to silence. To be sure, Gilman "could not have reopened another conversation when the previous conversation begun by [Hernandez] had not ended." *Coriz*, 2018 WL 4222383, at *9. Hernandez played an active role in continuing that conversation—a crucial detail that is fatal to the Government's claim that Gilman voluntarily, knowingly, and intelligently waived his *Miranda* rights when he initiated conversation with Hernandez. *See* Doc. 95 at 5-9. And after Gilman invoked those protections, Hernandez never terminated the encounter as he was required to under *Berghuis*. Instead, he effectively ignored that request and continued the interrogation by stating the following:

> Just know. Just know that . . . I'm here to . . . If you want to help yourself, you need to help me dude. Cause I'm gonna help you if you're honest with me. Do you understand what I'm saying? Cause we did our homework. We got DNA. We got witnesses. We got video. And you're a convicted felon. Okay? We got guns with your DNA. I ain't gonna charge you. State will charge you probably right now. But guess where else you're gonna go. You're going to the fed homie. You really wanna go this route with not talking to me? I already called ATF. They're ready to take you. You still wanna be quiet and not talk to me?

Gov't Ex. 1 at 3:09-4:05.

By discussing possible federal charges and the involvement of federal law enforcement, Hernandez was attempting to exert greater pressure on Gilman to discuss the alleged crime and elicit an incriminating statement from him. It is unsurprising then that this improper interrogation eventually led Gilman to incriminate himself (and potentially Leyva). Ultimately, Gilman's responses to this mounting pressure were borne, not of his own volition, but of the "inherently compelling pressures" of Hernandez's continued interrogation. *Maryland v. Shatzer*, 559 U.S. 98, 104-05 (2010) ("[A]ny subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect." (internal quotation marks omitted)); *see Rambo*, 365 F.3d

7

at 911 (holding that the defendant's capitulation and agreement to talk to police was not at his own behest but rather the product of the officer actively continuing the interview after the defendant invoked silence); *Coriz*, 2018 WL 4222383, at *8-9 (holding that there was no valid waiver where the defendant invoked the right to silence, questioning continued, and the defendant resumed conversation only in response to continued pressure).

Even after pausing the interview to allow another inmate to pass through the booking room, Hernandez reinitiated the interrogation once that inmate was no longer around. But he was still not authorized to do so. Police may only reinitiate questioning if the following conditions are met: "(1) at the time the defendant invoked his right to remain silent, the questioning ceased; (2) a substantial interval passed before the second interrogation" occurred; (3) officers gave the defendant "a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation [was] unrelated to the first." *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006) (quoting *Mosley*, 423 U.S. at 104-05). These prerequisites are lacking here. The questioning did not stop after Gilman invoked his right to remain silent; a substantial interval did not pass before the second interrogation occurred; Hernandez did not provide Gilman with a fresh set of *Miranda* warnings; and the subject of the second interrogation was related to the first. Thus, Hernandez was not authorized to reinitiate the interrogation. In sum, Gilman's statements after this reinitiation should be suppressed.

**II.     Because Gilman's statements were involuntary, they are inadmissible as impeachment evidence.**

A defendant's involuntary statement is inadmissible as impeachment evidence. *See Coriz*, 2018 WL 4222383, at *9 (quoting *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978)). To determine involuntariness, courts look at "whether, considering the totality of the circumstances, the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Erving L.*, 147 F.3d 1240,

8

1248-49 (10th Cir. 1998). Courts specifically consider both the details of the interrogation and the characteristics of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1976). In so considering, the relevant factors include (1) the suspect's age, education, and intelligence; (2) whether the suspect has been arrested and given *Miranda* warnings on earlier occasions, indicating previous experience with the criminal justice system; (3) the length of the detention and questioning; (4) the nature of the detention and questioning, such as whether threats or promises of leniency were made; (5) any advice of a suspect's constitutional rights; (6) the use of physical punishment; and (7) whether the suspect confessed to the crime or consistently denied any involvement in the crimes throughout the interview. *Id.*; *Coriz*, 2018 WL 4222383, at *9. "A suspect's personal characteristics are only relevant if the court first concludes that the officer's conduct was coercive." *Coriz*, 2018 WL 4222383, at *9 (citing *United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006)).

Here, the Court has already concluded that Hernandez's conduct was coercive: he failed to scrupulously honor Gilman's invocation of his right to silence by failing to terminate the interrogation after Gilman invoked. And after he continued the questioning, Hernandez exerted greater pressure on Gilman by discussing potential leniency (vague offers to "help" Gilman), the evidence against him (the DNA, the witnesses, and the video), and possible federal charges (stemming from Gilman's status as a felon). *See* Gov't Ex. 1 at 3:30-4:05. This occurred all while Gilman was in custody, Doc. 95 at 3, handcuffed, Gov't Ex. 1 at 7:44, and surrounded by at least three uniformed police officers, *id.* at 2:15. While vague offers of leniency *alone* are insufficient to establish coercion, *see Lopez*, 437 F.3d at 1064-65, it is the combination of tactics and environment that weighs in favor of a finding of coercive police conduct.

The next inquiry is whether Gilman's personal characteristics mitigate the coercion. They

9

do not. This is because, even though Gilman was purportedly a twenty-one-year-old of at least average intelligence with no apparent mental defect and an eighth-grade education, Doc. 95 at 7, the crucial fact remains that when Gilman invoked his right to remain silent that request was not scrupulously honored. That omission is dispositive of the question at bar. Because Gilman's statements were made involuntarily, it cannot be used by the Government as impeachment evidence. *See Mincey*, 437 U.S. at 397-98.

**III.    The Court denies Leyva's Motion to Sever as moot.**

Leyva argues that his trial should be severed because the admission of Gilman's statement to police would violate Leyva's Sixth Amendment right to cross-examine witnesses and the jury would be prevented from making a reliable judgment about Leyva's guilt. Doc. 85 at 2, 5. The Government opposes the motion, asserting that limiting instructions and redactions will mitigate any risk of prejudice. Doc. 94 at 4-6. Because the Court grants Gilman's motion, Leyva's concerns about admission of Gilman's statements are moot. Leyva's motion is therefore denied.

## CONCLUSION

For the foregoing reasons, the Court grants Gilman's motion to suppress. Doc. 84. It is hereby ordered that Gilman's statements after invoking the right to silence must be suppressed and cannot be used in either the Government's case-in-chief or as impeachment evidence. The Court denies Leyva's motion to sever as moot. Doc. 85.

It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA